RENDELL, Circuit Judge,
dissenting:
We face a conundrum in this case in that we have two diametrically opposed Supreme Court precedents regarding the level of scrutiny to be applied. While reasonable minds definitely do disagree on this issue, I must respectfully dissent from the majority’s conclusion that Reed v. Town of Gilbert, Arizona, — U.S. ——, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015), controls this case rather than the Supreme Court’s jurisprudence establishing the secondary effects doctrine. In declining to apply the doctrine here, the majority reasons that “any application of [it] beyond what the Supreme Court has explicitly endorsed would bring this case into direct conflict with Reed’s pronouncement that we cannot look behind a facially content-based law to a benign motive in order to shield the law from the rigors of strict scrutiny.” Maj. Op. 163. It therefore sends 18 U.S.C. §§ 2257 and 2257A to face strict scrutiny, likely dooming these laws that were enacted to reduce the criminal harm to minors that flows from child pornography. But rather than take this drastic step, I am of the view that we should apply the secondary effects doctrine — which has direct application here — and save these laws from unconstitutionality. Cf. Nat’l Fed’n of Indep. Bus. v. Sebelius, — U.S. -, 132 S.Ct. 2566, 2594, 183 L.Ed.2d 450 (2012) (“[EJvery reasonable construction must be resorted to, in order to save a statute from unconstitutionality.” (citation and internal quotation marks omitted)).[1]
The secondary effects doctrine has long served as an exception to the rule that facially content-based laws must undergo strict scrutiny. See, e.g., City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47-49, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (applying doctrine and concluding that a law was content neutral even though on its face it “treat[ed] theaters that specialize in adult films differently from other kinds of *174 theaters”).[2] Under the doctrine, a facially content-based law will nonetheless be deemed content neutral and thus subject to intermediate scrutiny if it was enacted not to suppress protected speech but to reduce harmful secondary effects — such as crime — that are uniquely caused by or associated with the protected speech that is singled out by the law. Id. at 48, 106 S.Ct. 925; see also Elena Kagan, Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine, 63 U. Chi. L. Rev. 413, 483 (1996) (“The essence of the secondary effects doctrine runs as follows: facially content-based regulations of speech that ‘are justified without reference to the content of the regulated speech’ should be treated as if they made no facial distinctions on the basis of content.” (citations omitted)).
In 2015, however, the Supreme Court complicated matters when it issued its opinion in Reed v. Town of Gilbert, a case involving a local sign ordinance that the Court held to be content based on its face. In reversing the Ninth Circuit and striking down the ordinance, the Court stressed that “the crucial first step in the content-neutrality analysis” is “determining whether the law is content neutral on its face.” 135 S.Ct. at 2228. Then, seemingly departing from prior precedent, it stated that “[a] law that is content based on its face is subject to strict scrutiny regardless of the government’s benign motive, content-neutral justification, or lack of ‘animus toward the ideas contained’ in the regulated speech.” Id. (citation omitted); see also id. (“In other words, an innocuous justification cannot transform a facially content-based law into one that is content neutral.”).
The secondary effects doctrine thus seems logically irreconcilable with Reed. The doctrine constitutes an exception to the rule that facially content-based laws must undergo strict scrutiny. But we are left wondering whether Reed has eliminated this exception with its sweeping rule that facially content-based laws are subject to strict scrutiny regardless of the government’s motives for enacting the law. It would appear so.[3]
Yet we cannot conclude that the secondary effects doctrine no longer applies, because the Court in Reed never addressed or even mentioned it — let alone overruled Renton or any of the other secondary effects precedent. The Court has admonished that other courts cannot conclude that “[its] more recent cases have, by implication, overruled an earlier precedent.” Agostini v. Felton, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 1997; see also Shalala v. Ill. Council on Long Term Care, Inc., 529 U.S. 1, 18, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000) (“This Court does not normally overturn, or so dramatically limit, earlier authority sub silentio.”).[4]
We must therefore decide how to resolve this conflict between Supreme Court precedent applying the secondary effects doctrine and Reed’s, sweeping rule that facially content-based laws must undergo strict scrutiny. Fortunately, the Supreme Court has given us guidance as to how to do so: it has instructed that “[i]f a precedent of this *175 Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.” Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). The issue, then, is whether the secondary effects doctrine — which seems to rest on reasons rejected by the Court in Reed— has “direct application” in this case. Or, does Reed’s sweeping rule have “direct application” here such that §§ 2257 and 2257A must undergo strict scrutiny?
In my view, the secondary effects doctrine has direct application here. The Court over the years has applied the secondary effects analysis to laws involving a diverse range of subject matter.[5] But it has actually found such effects almost exclusively in the context of facially content-based laws that affect sexually explicit speech. See, e.g., City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 429-31, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) (ordinance prohibiting no more than one “adult entertainment business” in same building that was enacted to reduce crime in areas with these businesses); Renton, 475 U.S. at 47-48, 106 S.Ct. 925 (ordinance restricting the location of adult movie theaters that was enacted to reduce crime and blight in areas with these theaters); Young v. Am. Mini Theatres, 427 U.S. 50, 52-55, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (plurality opinion) (same).[6] Indeed, the Court created the doctrine based on the premise that sexually explicit speech by its very nature can cause or correlate with societal harms such as crime and blight in a way that other kinds of protected speech typically cannot. See Am. Mini Theatres, 427 U.S. at 71 n. 34, 96 S.Ct. 2440 (agreeing that “a concentration of ‘adult’ movie theaters causes the area to deteriorate and become a focus of crime, effects which are not attributable to theaters showing other types of films”).
Furthermore, the Court has repeatedly articulated a related, but even more fundamental, reason as to why the doctrine and intermediate scrutiny should apply to laws affecting sexually explicit speech: this kind of speech, though protected, categorically deserves less protection than others kinds of protected speech. That is because, simply put, sexually explicit speech is not as vital to our society as other kinds of protected speech. See id. at 70, 96 S.Ct. 2440 (“[E]ven though we recognize that the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, it is manifest that society’s interest in protect *176 ing this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate .... [and that] few of us would march our sons and daughters off to war to preserve the citizen’s right to see [sexually explicit speech].”); Pap’s, 529 U.S. at 294, 120 S.Ct. 1382 (relying on this language); Renton, 475 U.S. at 49 n. 2, 106 S.Ct. 925. Thus, the plurality in American Mini The-atres — the case in which the secondary effects doctrine was first recognized — concluded that “[e]ven though the First Amendment protects communications in this area from total suppression, ... the State may legitimately use the content of these materials as the basis for placing them in a different classification” from other materials. 427 U.S. at 70-71, 96 S.Ct. 2440.[7]
To be sure, the Court has not blindly concluded that any law that affects sexually explicit speech would qualify as having been enacted to combat secondary effects of the protected speech. In Reno v. ACLU, for example, the Court held that the government could not rely on the doctrine because the law at issue sought to alleviate not secondary but “primary effects” of sexually explicit speech, which it defined as “ ‘the direct impact of [the] speech on its audience.’ ” 521 U.S. 844, 868, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (quoting Boos, 485 U.S. at 321, 108 S.Ct. 1157). The law was the federal Communications Decency Act, which criminalized “the knowing transmission of obscene or indecent messages to any recipient under 18 years of age,” as well as the “knowing sending or displaying of patently offensive messages in a manner that is available to a person under 18 years of age.” Id. at 859, 117 S.Ct. 2329. The Court rejected the government’s secondary effects argument, concluding that “the purpose of the CDA is to protect children from the primary effects of ‘indecent’ and ‘patently offensive’ speech, rather than any ‘secondary’ effect of such speech.” Id. at 868, 117 S.Ct. 2329; see also United States v. Playboy Entm’t Grp. Inc., 529 U.S. 803, 815, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (determining that doctrine did not save a federal law from strict scrutiny that restricted cable pornography because its objective was to shield children from “the primary effects of [the] protected speech”).
Given these parameters of the doctrine, I suggest that it has “direct application” in this case, although it “appears to rest on reasons rejected in [Reed ].” Rodriguez de Quijas, 490 U.S. at 484, 109 S.Ct. 1917. *177 Sections 2257 and 2257A are facially content-based laws because they impose restrictions based on the content of the speech, i.e., they apply only to depictions of “actual sexually explicit conduct” and “simulated sexually explicit conduct.” But the reason for the restrictions is based on a secondary effect of this protected speech, namely the criminal harm to children that flows from child pornography, a harm that is uniquely attributable, at least in some cases, to this speech. See Maj. Op. 153-54 (Congress enacted these laws because, despite the criminalization of child pornography, “producers of sexually explicit materials continued to utilize youthful-looking performers. Law enforcement was viewed as ill-equipped to visually determine these performers’ ages, and, as a consequence, the risk that children were still being used in pornographic materials remained.”). And “it is manifest that society’s interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in” protecting other kinds of speech. Am. Mini Theatres, 427 U.S. at 70, 96 S.Ct. 2440; see also id. at 70-71, 96 S.Ct. 2440 (“Even though the First Amendment protects communications in this area from total suppression, we hold that the State may legitimately use the content of these materials as the basis for placing them in a different classification [from other materials].”). Finally, §§ 2257 and 2257A were not enacted by Congress to mitigate any “primary effects” of this protected but low-value speech. See Free Speech Coal., Inc. v. Att’y Gen., 677 F.3d 519, 534 (3d Cir. 2012) (stating that Congress did not target the speech affected by these laws because of its “effect on audiences or any disagreement with [its] underlying message”).
Rather than hold that §§ 2257 and 2257A are subject to strict scrutiny in light of Reed, I would affirm the District Court’s determination that these laws are subject to intermediate scrutiny, but remand for it to apply the burden-shifting framework applicable to secondary effects cases as set forth by the Supreme Court in Alameda Books.[8] Thus, I respectfully dissent from this portion of the majority’s opinion.

. In Free Speech III, although we applied intermediate scrutiny and upheld §§ 2257 and 2257A as constitutional under the First Amendment, "we noted that the Statutes may not have been able to survive strict scrutiny.” Maj. Op. 158 (citing Free Speech Coal. Inc. v. Att'y Gen. (FSC III), 787 F.3d 142, 156 (3d Cir. 2015), vacated and reh’g granted, 787 F.3d 142 (3d Cir. 2015)); see also Burson v. Freeman, 504 U.S. 191, 211, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (”[I]t is the rare case in which ... a law survives strict scrutiny.”).

. But see City of Erie v. Pap's A.M., 529 U.S. 277, 291-96, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (plurality opinion) (relying on the secondary effects doctrine to uphold a facially neutral law).

. An argument could be made, however, that Reed, is not as broad as it seems, as the Court neither addressed the secondary effects doctrine nor unequivocally ruled out the possibility that strict scrutiny might not apply to a different facially content-based law.

.Indeed, other courts have reasoned that Reed’s failure to mention certain precedent calling for intermediate scrutiny means that that precedent survives Reed. See infra.

. See, e.g., City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 430, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (commercial speech); Boos v. Barry, 485 U.S. 312, 320-21, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (political speech).

. The majority contends that the Court has actually found such effects only in the narrow context of "regulations affecting physical purveyors of adult sexually explicit content.” Maj. Op. 161. But the plurality in Pap's rejected this myopic view of the doctrine. See Pap’s, 529 U.S. at 295, 120 S.Ct. 1382 ("Justice Stevens claims [in his dissent] that today we ‘[f]or the first time’ extend Renton’s secondary effects doctrine to justify restrictions other than the location of a commercial enterprise. Our reliance on Renton to justify other restrictions is not new, however. In Ward, the Court relied on Renton to evaluate restrictions on sound amplification at an outdoor bandshell, rejecting the dissent’s contention that Renton was inapplicable.”); see also McCullen v. Coakley, - U.S.-, 134 S.Ct. 2518, 2531-32, 189 L.Ed.2d 502 (2014) (relying on Ren-ton in concluding that abortion-clinic buffer-zone law was content neutral”); id. at 2543-44 (Scalia, J., dissenting) (criticizing the majority's reliance on Renton).

. The Court also established years ago that the Constitution "accords a lesser protection” to another distinct form, of speech — commercial speech — and has therefore applied intermediate scrutiny to laws affecting this speech. See Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm’n of N.Y., 447 U.S. 557, 562-66, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Notably, because the Court in Reed never even mentioned Central Hudson, at least two district courts in California have concluded that Reed does not compel strict scrutiny for laws affecting commercial speech. See CTIA-The Wireless Assoc. v. City of Berkeley, Cal., 139 F.Supp.3d 1048, 1061 (N.D. Cal. 2015) ("The Supreme Court has clearly made a distinction between commercial speech and noncommercial speech, see, e.g., Central Hudson ..., and nothing in its recent opinions, including Reed, even comes close to suggesting that that well-established distinction is no longer valid.”); Cal. Outdoor Equity Partners v. City of Corona, No. CV 15-03172, 2015 WL 4163346, at *10 (N.D. Cal. July 9, 2015) (“Reed does not concern commercial speech, let alone bans on off-site billboards. The fact that Reed has no bearing on this case is abundantly clear from the fact that Reed does not even cite Central Hudson, let alone apply it.”); see also Citizens for Free Speech, LLC v. Cty. of Alameda, 114 F.Supp.3d 952, 968-69 (N.D. Cal. 2015) (rejecting plaintiffs' argument that Reed governed a regulation that banned commercial speech and applying intermediate scrutiny to that regulation).

. See 535 U.S. at 426, 122 S.Ct. 1728 ("The [government’s] evidence must fairly support [its] rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the [government’s] evidence does not support its rationale or by furnishing evidence that disputes the [government’s] factual findings, the [government] meets the standard set forth in Ren-ton. If plaintiffs succeed in casting doubt on a [government's] rationale in either manner, the burden shifts back to the [government] to supplement the record with evidence renewing support for a theory that justifies its ordinance.”).